KENNETH MOORE MURPHY v. EDWARDS AND WARREN, A PROFES-
SIONAL ASSOCIATION, MARK EDWARDS AND JOE WARREN, III

No. 7726SC551

(Filed 20 June 1978)

1. **Attorneys at Law § 5.1— malpractice—negligence—conflict of interest—prox-
imate cause**

     The fact that plaintiff brought an action for attorney malpractice both on
grounds of negligence and grounds of improper conduct by the attorneys in
representing clients with conflicting interests does not alter or remove the re-
quirement that the actions of the attorneys be shown to have been a prox-
imate cause of the alleged damages. It is not required in either situation,
however, that the actions of the attorneys be the sole cause of the client's loss.

2. **Attorneys at Law § 5.1— malpractice—negligence—conflict of interest—insuf-
ficient evidence of proximate cause**

     In an action for malpractice brought against attorneys by their client
based on alleged negligence and conflict of interest in carrying out duties on
behalf of the client in regard to investments made by the client in a cattle
feeding and selling venture with a Kansas company, plaintiff's evidence was in-
sufficient to show that alleged negligence or unethical conduct by defendant
attorneys was a proximate cause of the loss of plaintiff's investments in the
cattle venture and was, therefore, insufficient to withstand defendants' motion
for a directed verdict where it failed to show whether the Kansas company
and the owner of the company were unable to meet their obligations to in-
vestors and others at any of the times plaintiff made investments in the cattle
venture.

APPEAL by defendants from *Gaines, Judge.* Judgment
entered 29 December 1976 in Superior Court, MECKLENBURG
County. Heard in the Court of Appeals 4 April 1978.

This appeal involves an action for malpractice brought
against attorneys by their client for alleged negligence in carry-
ing out duties on behalf of the client arising from the attorney-
client relationship and for representing the client while also
representing others with conflicting interests. The defendants ad-
mitted in their answer to the complaint of the plaintiff that an
attorney-client relationship existed between them and the plain-
tiff at all times pertinent to this appeal.

The plaintiff offered evidence in the form of his own
testimony and that of the defendants and others. The plaintiff's
evidence tended to show that the plaintiff, Kenneth Moore Mur-

phy, called Mark Edwards, one of the defendants, early in January of 1974 to seek his assistance with regard to a $15,000 investment. Murphy had first thought his investment was in a tomato farm but had discovered subsequently that it had been made in a cattle feeding venture. Murphy expressed displeasure that his investment was in cattle rather than in the tomato farming operation he had hoped to use as a tax shelter. The defendant Edwards told Murphy that he too was involved in a cattle investment which might be better than that in which Murphy had invested.

As a result of the telephone conversation between the plaintiff and the defendant Edwards, a meeting was held on 14 January 1974 in the law office of the defendants. At the meeting the plaintiff was introduced to one Gresham Northcutt. Edwards explained generally the nature of a possible investment in a cattle feeding and selling operation with McKinney Cattle Company [hereinafter the "Company"] of Hutchinson, Kansas. Northcutt was to be the "connection" between the investors and the Company. The plaintiff attended this meeting with the certified public accountant who handled his affairs. The plaintiff testified that during this meeting the defendant Edwards told him that he could expect an annual return on his investment in the neighborhood of 60 percent and that the investment was as safe or safer than government bonds. During the meeting Edwards at no time suggested the plaintiff should invest but stated that he had invested in the venture and felt it to be sound.

The plaintiff had been in communication with members of the trust department of The Northwestern Bank and wished to establish a foreign trust to be managed by the bank's branch in the Cayman Islands in order to avoid taxes. The defendant Edwards researched this prospect and informed the plaintiff that he could not lawfully avoid taxes in this manner.

The plaintiff did not immediately invest in the venture. He testified that, between 14 January 1974 and 8 March 1974 he did "some checking" on Wallace McKinney, the head of the Company, with a friend who was employed by The Northwestern Bank. The plaintiff testified that this friend advised against his investing in a cattle venture. The plaintiff further testified that his banker friend offered to check on McKinney and, after checking, in-

formed the plaintiff that McKinney was highly thought of in the community. The plaintiff also testified that prior to investing any money in the venture he spoke to Mr. Wallace McKinney directly by long distance telephone call on 28 January 1974 and 4 March 1974.

On 3 March 1974 the plaintiff forwarded a contract for 1,200 feeder cattle with the Company and a check in the amount of $180,000 directly to McKinney in Kansas. He had previously gotten the contracts from Gresham Northcutt, although it was conceded by the defendants that the contract form had been prepared for Northcutt by the defendant Warren who had amended a form contract previously used by the Company. Essentially the contracts executed by the plaintiff and other investors provided that the Company was to use the investors' money to purchase cattle for the investors. The Company was then to borrow money for the purchase of feed against the value of the cattle. It would feed the cattle until they were ready for market and sell them at a profit guaranteed by means of presale contracts entered into prior to the purchase of the cattle.

The Company was to segregate the cattle in order that they could be identified as belonging to particular investors. The investment contract executed by the plaintiff provided for a finder's fee of $3.00 per head purchased to be paid by the investor to Northcutt. The contract also provided that it was to be governed by the law of Kansas. Northcutt had numerous financial dealings with McKinney and the Company and had set up BeTex Corporation to receive these finder's fees with McKinney's approval.

At the time the plaintiff forwarded the contract for 1,200 steers and the $180,000 check to McKinney, he did not pay the finder's fee to Northcutt as provided in the contract. Northcutt called the defendant Edwards and informed him that the plaintiff was going to feed 1,200 steers and had not provided the finder's fee required. During April of 1974, the plaintiff forwarded the finder's fee directly to Northcutt. Northcutt then sent one-third of the fee, or $1,200, to the defendants pursuant to an agreement previously entered with them. Both the plaintiff and the defendant testified that the plaintiff did not inform them he had made the investment at this time. The defendant Edwards testified,

however, that he was probably aware of an investment by the plaintiff as a result of receiving $1,200 from Northcutt pursuant to their agreement. The evidence was in conflict as to whether the fee to the defendants was for representing Northcutt, BeTex Corporation, the plaintiff or all of these.

On 4 June 1974 the plaintiff discussed with Edwards the possibility of obtaining more feeder cattle. He did not remember the contents of that conversation but stated that they talked about the Company's cattle operation generally. On 11 June 1974 the plaintiff forwarded a contract for 200 more cattle to McKinney with a check in the amount of $30,000. The plaintiff paid Northcutt a $600 finder's fee at this time, and one-third of the finder's fee was forwarded by Northcutt to the defendants. The plaintiff had no knowledge of whether the defendants knew of this contract.

The contract of March, 1974, provided for payment of the principal and profits to the plaintiff by the Company on 20 September 1974. When this payment was not forthcoming, the plaintiff telephoned the defendant Edwards on several occasions. These calls were made between September and early November. The plaintiff testified that the defendant Edwards informed him that McKinney was having trouble with one of the banks in Kansas. Edwards stated that the examiners had objected to money being used for the benefit of investors outside the trading area, and McKinney had been required to pay off those loans by selling some of his own cattle. Edwards also told him that it wasn't too unusual for the payments not to be forwarded when due under the contracts as the Company's bookkeeping was sloppy. The plaintiff also talked directly to McKinney by long distance telephone call on four occasions between 22 October 1974 and 15 November 1974.

The plaintiff was paid $56,000 profit and $3,900 interest from the March contract on 11 November 1974. He spoke to the defendant Edwards on that date and informed him that he had received the profit on his first investment of $180,000, but that he had not received the principal. The defendant Edwards stated that perhaps McKinney thought the plaintiff wanted to "roll it over" or reinvest the principal in a similar contract.

Edwards wrote a letter to the plaintiff on 12 November 1974 in which he requested the plaintiff inform him if he did not get his investment back. Edwards heard nothing further from the plaintiff during the month of November.

The defendant Warren went to Kansas in November to check on the investments. On 15 November 1974 he learned that McKinney had unlawfully used investors' money to pay a personal note to a Kansas bank. He discussed this matter with McKinney and indicated to him that this action was totally improper and violated his obligations under the investment contracts. Warren testified that knowledge of these facts "raised red flags" concerning the contracts. Numerous other North Carolina investors represented by the defendants, however, received full payment after this meeting. Warren did not learn the amount of the personal note paid by McKinney, which was $489,000, until 26 December 1974.

The plaintiff, having last talked personally with McKinney on 15 November 1974, reinvested his original $180,000 in another contract, or "rolled over" his investment, on 25 November 1974. The plaintiff also invested another $30,000 in an additional feeder cattle contract with the Company at this time. The plaintiff testified that he was not satisfied with the "rollover" but that "it looked like the best thing I could do at the time, hoping that things might work out." The plaintiff did not consult with the defendants with regard to increasing his investment by $30,000, as he did not think it was necessary to inform them of his intention to invest. The defendants received no fee in connection with this investment.

During his visit to Kansas and discussion with McKinney on 25 November 1974, the defendant Warren attempted to obtain full payment for all investors. McKinney promised at that time that payment would be forthcoming. Warren wrote McKinney a letter on 2 December 1974 urging payment and accusing McKinney of possible improper or illegal conduct. Warren testified that he had no additional knowledge at this time but was mad because McKinney hadn't made payment as he had promised. Warren learned from Northcutt on 17 December 1974 that the plaintiff had "rolled over" his $180,000 investment with McKinney. On 17 December 1974, Warren again wrote a letter of complaint to McKinney.

Edwards talked to the plaintiff on 10 December 1974 and told him he felt things were going well as everyone had been paid. He based this statement on the fact that he had received payment on his own investments four days previously. Later during the day of 10 December 1974, however, Edwards and Warren discovered that three investors in Georgia had not been paid. They informed the plaintiff of this fact on the same day.

The defendant Edwards called the plaintiff on 23 December 1974 to tell him that Wallace McKinney was coming to Charlotte later that month and to ask if the plaintiff wished to meet with Edwards concerning the anticipated visit. The plaintiff told Edwards at that time that he had worked out his problems and had "rolled over" his investment.

The defendants met with McKinney and officers of the Hutchinson National Bank on 26 December 1974 for the purpose of having him answer questions about the status of the Company. On the following day, the same individuals, together with a number of the investors, met with McKinney. At this time all were informed that McKinney and the Company did not show enough assets to satisfy the claims of investors who had purchased cattle. The defendant Edwards testified that this was the first occasion to his knowledge on which either McKinney or the Company had not had assets sufficient to satisfy outstanding obligations.

McKinney informed the defendants on 26 December 1974 that he was operating a "ponzi deal" or using new investors' funds to pay principal and interest to former investors. The defendants initiated a suit on behalf of the plaintiff and other investors on 27 December 1974. In January of 1975, however, the defendants informed the investors of a potential conflict of interest which would preclude them from representing the investors in that case.

At the conclusion of the plaintiff's evidence, the defendants moved for a directed verdict in their favor on the stated grounds that the plaintiff's evidence, when considered in the light most favorable to him, failed to present a case of actionable negligence against any of the defendants proximately causing injury to the plaintiff. The court denied the motion and the defendants presented their evidence which will not be summarized here. At the close of the defendants' evidence, they again moved for a

directed verdict on the stated grounds. The trial court denied the motion. The jury returned a verdict against the defendants, and the defendants moved for judgment notwithstanding the verdict. The trial court denied the motion and entered judgment. From verdict and judgment ordering the plaintiff recover $180,682.41 from the defendants, the defendants appealed.

*Andrew D. Taylor, Jr., Robert A. Melott and Edwin Marger for plaintiff appellee.*

*William E. Underwood, Jr. and J. J. Wade, Jr. for defendant appellants.*

MITCHELL, Judge.

By their exceptions and assignments of error relating to the trial court's denial of their motions to dismiss and for judgment notwithstanding the verdict, the defendants have presented for decision on appeal the question of whether the trial court erred in denying the defendants' motions for a directed verdict made at the close of the plaintiff's evidence and renewed at the close of all the evidence, in rendering a judgment on the verdict and in denying the defendants' motions for judgment notwithstanding the verdict. In determining whether the evidence was sufficient to withstand the defendants' motions for a directed verdict pursuant to G.S. 1A-1, Rule 50, all of the evidence which tends to support the plaintiff's claim must be taken as true and considered in the light most favorable to him, giving him the benefit of every reasonable inference which may be legitimately drawn therefrom, with contrasts, contradictions, conflicts and inconsistencies resolved in his favor. *Jenkins v. Starrett Corp.,* 13 N.C. App. 437, 186 S.E. 2d 198 (1972). *See also Bowen v. Gardner,* 275 N.C. 363, 168 S.E. 2d 47 (1969). We find that, when subjected to these rules, the evidence introduced did not constitute a showing sufficient to withstand the defendants' motions for a directed verdict.

[1] The general rule that negligence is actionable only when it is a proximate cause of the damages claimed applies in actions against attorneys for negligence in representing their clients. Annot., 45 A.L.R. 2d 5 (1956). The fact that the plaintiff brought this action for attorney malpractice both on grounds of negligence and on grounds of improper conduct by the defendants in representing clients with conflicting interests, does not alter or remove

this requirement that the actions of the attorneys be shown to have been a proximate cause of the alleged damages. Annot., 28 A.L.R. 3d 389 (1969). It is not required in either situation, however, that the actions of the attorneys be the sole cause of the client's loss. Annot., 28 A.L.R. 3d 389 (1969); *see also Wise v. Vincent*, 265 N.C. 647, 144 S.E. 2d 877 (1965).

[2] ⸳ Assuming arguendo that an attorney-client relationship existed between the parties herein, as admitted in the defendants' answer, and that the defendants were negligent in performing their duties as the plaintiff's attorneys and improperly represented clients with conflicting interests, we find the evidence insufficient to support his claim for relief. The evidence, when construed in the light most favorable to the plaintiff, is devoid of any indication that the damages alleged were proximately caused by the negligence or conflict of interest of the defendants. There is no evidence from which it can be inferred that, on any of the occasions the plaintiff invested with the Company, it was unable to meet its obligations. Conversely, there is no evidence tending to show that at any of those times the Company was able to meet those obligations. There is a similar lack of evidence with regard to McKinney's ability to meet his obligations.

The plaintiff did offer evidence tending to show that the defendants had knowledge by 25 November 1974 that McKinney had engaged in certain illegal and improper conduct. This is not equivalent, however, to a showing as to the actual financial condition of McKinney or the Company at any of the times pertinent. The possible motivation of an individual for engaging in illegal or improper conduct with regard to financial dealings are literally limitless. Financial difficulty causing inability to meet one's obligations constitutes only one possible motivation among many. Others, including carelessness, basic dishonesty and incompetence, are equally likely. The evidence of illegal and improper conduct by McKinney in a highly speculative area of financial dealings, therefore, could only have led the jury to speculation and conjecture as to the actual financial status of either McKinney or the Company. As the jury was required to determine the actual financial status of McKinney and the Company at various points in order to find a causal connection between the acts or omissions of the defendants and the loss of the plaintiff, they

were left to base such determinations of actual financial status and resulting loss solely upon speculation and conjecture which will not support a verdict. *See Ingold v. Light Co.*, 11 N.C. App. 253, 181 S.E. 2d 173 (1971).

The plaintiff also offered evidence tending to show that in late December, 1974, McKinney and the Company were unable to meet their financial obligations. This is not evidence, however, tending to show whether they were unable to meet their obligations at any of the times the plaintiff invested. There is, therefore, no evidence tending to show that a more complete initial investigation or later monitoring of the investment by the defendants would have indicated any inability or unwillingness to meet financial obligations on the part of McKinney or the Company which would or should have discouraged the plaintiff from investing. This lack of evidence also represents a failure to make any showing that, had the defendants been engaged in completely ethical and proper conduct, the plaintiff would have been spared loss. As the plaintiff offered no evidence tending to show that either the alleged negligence of the defendants or their alleged improper and unethical conduct was a proximate cause of his loss, his evidence does no more than raise conjecture as to these matters insufficient to withstand the defendants' motion for a directed verdict. *Compare Tillis v. Cotton Mills*, 251 N.C. 359, 111 S.E. 2d 606 (1959) *and Meares v. Construction Co.*, 7 N.C. App. 614, 173 S.E. 2d 593 (1970) *with Ingold v. Light Co.*, 11 N.C. App. 253, 181 S.E. 2d 173 (1971).

The trial court having denied their motion for a directed verdict at the close of the plaintiff's evidence, the defendants elected to offer evidence. In passing upon a motion for directed verdict made at the close of all the evidence, a defendant's evidence that tends to contradict or refute the plaintiff's evidence is not considered, but other evidence presented by a defendant which is not in conflict with that of the plaintiff may be considered in ascertaining whether the evidence is sufficient to raise an issue for the jury. *Blanton v. Frye*, 272 N.C. 231, 158 S.E. 2d 57 (1967); *Jenkins v. Starrett Corp.*, 13 N.C. App. 437, 186 S.E. 2d 198 (1972). Upon review of the evidence offered by the defendants in its entirety and drawing every legitimate inference therefrom in favor of the plaintiff, we find the defendants' evidence added nothing tending to show a causal relationship between the alleged conduct of the

defendants and the plaintiff's damages. The trial court's denial of the defendants' motion for a directed verdict at the close of all the evidence was, therefore, erroneous. The judgment of the trial court must be reversed and the verdict set aside. As the defendants moved in apt time for judgment notwithstanding the verdict, the cause is remanded to the trial court with the direction that judgment be entered in accordance with the defendants' motion for a directed verdict in their favor. *Nichols v. Real Estate, Inc.,* 10 N.C. App. 66, 177 S.E. 2d 750 (1970).

For the reasons stated, the judgment of the trial court is

Reversed and the cause remanded.

Chief Judge BROCK and Judge HEDRICK concur.